District Court ruled that Dr. Heyer's testimony was to be credited in full. Washington law does not require quantification for the matters we're talking about here, but Dr. Heyer's testimony, when credited in full, provides substantial quantification that Mr. Botts' shipyard wide exposure to asbestos. Well, it's not clear what it means to be credited in full. I mean, I guess he meant that he wasn't lying, but he actually believed what he was saying. But on the other hand, he did take apart a lot of what Dr. Botts said as not being pertinent or proving what it was said to prove. Well, I understand the context I took it in. He was basically saying there was no Daubert challenge or other challenge. Therefore, I have to accept it. I recognize that he disagreed with it, and if it were irrelevant, I would agree that would be a perfectly good point. But as I'm about to say, it was relevant, and if relevant, I take it the rule is. And this being a summary judgment, it not only should be credited, but given the inferences in favor of us as the non-moving party. Counsel, here's the critical question for me. It stopped you when you started talking about this shipyard wide exposure. But for me, what is the amount of exposure that's attributable to the violations of the rules by the government? And that segues, that is what Dr. Heyer talks about. And if I could just go through it, there are two declarations. One's at ER 83 through 86 or 87, and one's at ER, it's like 235 to 239. And let me just address it, I'm just trying to be, I tried to be methodical. At ER 83, paragraphs eight and nine, Dr. Heyer provided quantification that two thirds of the entire asbestos exposure would have come from activities generating high amounts of asbestos, which is called 25 fibers per cubic centimeter. He then says that more than, and that's two thirds of all the exposure added. He then says that more than half of that two thirds, sorry, or more than a third would have been due to asbestos removal, asbestos from asbestos removal activities. He then says, and it's ER 86, paragraph 15, that had the asbestos containment, which was required, effective in March of 1970, been actually done, that would have removed 90% of the asbestos removal. Just to draw it back, that would be the more than 90%. Where's the 90%? What number? It's paragraph 15 on ER, if my notes are right, ER 86, paragraph 15. No, 15 is the one that says that it would be 20% of his work that year would have been spent with asbestos. I'm sorry, you're right, I apologize, it's paragraph 14. It says the proper use of containments in connection with the removal and cleanup. It says very substantially. That says by at least a factor of 10, which I take it to mean, the way you do factors is it's one to 10. I mean, I believe the words by a factor of 10 means it would have reduced it from 100% to 10%. I mean, that is, and if you look at his thing, he kind of talks about that, but that's what I understand the words a factor of 10 to be. And that would be on a continuous basis, 24-7, 365? Because the concept here, remember, is the asbestos removal, it doesn't happen that often. You're tearing the stuff out of the shifts, but it's very intense when it happens. What the rules say is that when you do asbestos removal, and this was effective in March of 1970, you have to have containments in order to keep the dust from seeping into the other areas. What I was saying, if my read of a factor of 10 is right, is it would have reduced it from 100% of what it had been to one-tenth of that, or 10%. I gather that, go ahead. You said that the removal didn't happen that often. Right. And so to the extent that it didn't happen that often, then how do we know that your client was exposed to the asbestos during those time frames when he was there? Because, and this segues into another thing, when I say it doesn't happen that often, I mean that in the lifespan of a ship being repaired, they tend to remove things first, and then they repair it and fix it. We know that from the Beckett declaration, which I also, it's not the declaration, it's the Beckett 1970 report, which I talked about in the brief. What he says, and I don't have the exact quote, but the gist of it is that when removal activities are going on, you have excessive amounts of exposure for weeks at a time. This is for a given ship. So when I say it doesn't happen all the time, that's true. But it goes on, according to the PSNS Industrial Hydra list, it goes on and produces large amounts of dust for weeks at a time per ship. He also says, and we attach a variety of things, Beckett says it, an article by Dr. Marr, which is also in the record, says it, is that whenever a ship is in for what's called overhaul or a major repair, you have to remove asbestos. And so it's a given. And the way, what you do then is if you look at, there's a, I think it's ER, and I may be wrong on this, it's like there's a ship list that talks about overhauls or conversions, or what they did with the thing. And it shows when the ships came in and when they left. And it shows it during the entire relevant period. For example, and I can just, because I happen to know this, in 1970, after the effective date of the requirement that you have containment, there were three ships that came in, in 1970. They were, bear with me for a moment. It doesn't really matter. I'm sorry? What their names were. It doesn't much matter what their names were. The Constellation is one. I may have to go back. There were three ships. It's at page 163. Yeah, okay. It was the Constellation, it's ER 163, the Constellation, the Simon Lake, and the Patrick Henry, which were all in for either regular overhauls or what's called conversion, which is even a bigger deal. And the ships were in for more than a year. They all came in. They arrived, the Constellation arrived in June of 1970, Simon Lake in July of 1970, and the Patrick Henry in November of 1970. So, and this is simply a matter of logic. You have to rip stuff out first before you fix it. I mean, it's like with anything. What was the period, the effective date of the regulation that was being, that you said was violated? March of 1970. And that's the one that said, the first one, it's at page five or six of the ER. And when did he stop delivering food to the ship? He stopped, he lost the contract in March of 1971. 71? I'm having a hard time hearing you. I don't know if it's you or the system. I apologize, I'm looking at you, and maybe I'm doing it wrong. It was in March of 1971. So, the containment rules were in effect. So why did the judge say there was only one month overlap? Well, he was talking about a different rule, and he was wrong, but I'll explain that. The containment rules were effective in March of 1970, and I think there is no dispute about that. What went into effect in February of 1971 was a new rule that talked about asbestos installation. And what the judge was saying then is that because the installation rule did not go into effect until February of 1971, and he stopped delivering food in March of 1971, there was only a one-month relevant period. Where the judge is wrong about that is both in his earlier order, and the order's in the record, he acknowledged, and Mr. Botts' testimony is actually quite clear on that, in the five years after he stopped delivering food, he was going to the PSNS two times a week, same amount, and what he said is, for that five years, sometimes he often went to boardship, and other times he went to boardship less often. So during this whole period, he was going to boardship, and that's what he was talking about. He says when it was a boardship, he says it was always dusty, there was always construction going on, and he remembers, and I believe the term is, quite a few times he saw people mapping pipes. Let me ask you about that. As far as the construction, and as far as seeing all these people work, was your client specific as to the time frame so that he would have observed this during the 71 to 76 time frame? He wasn't asked it in quite those terms, but if you look the way I read it, well, here's what he said, and I'll have to do it in chunks. He said during the entire time when he went aboard, he said there was always construction going on, and he talked about examples of construction which involved wrapping pipe is the term they use, insulating pipe. I gather the reason the ships were there was to get refurbished, that's why they were there. Yes. Right. Yes. We're not talking about operating ships. Right. Well, I mean, they couldn't sail. The sailors, when it was delivering food, except for a certain part of the period, the sailors were living on the ship. But yeah, they were there to be fixed, but that's kind of the point, the fixing, and they were there for, and I'll use those terms again, what's called a regular overhaul or a conversion. Those are very big repairs which involve both a lot of tearing up. Let me, we haven't discussed the legal framework at all to this point, and there obviously is a big, or a difference, whether it's big or not is what I want you to tell me, between the Washington cases which are essentially dealing with the question, if there are a set of different manufacturers of asbestos, who can be a defendant in one of these cases where someone is certainly being exposed to asbestos over a time period, but the question is, is it being exposed to your asbestos? Is that right? Yes. And here we have a slightly different problem, which is he was being exposed to asbestos other places, and I guess one can even assume that he was, or perhaps one could assume that he was being exposed to asbestos here, but the question is, was he being exposed to asbestos that was in violation of particular regulations, the exposure? Yes. So how does one transpose, or why should we regard Lockwood and its progeny as binding here? Because both Lockwood in this case are negligence cases, and I think that's established. The negligence here is not, in Bott's case, is not following the mandatory requirements which require two things. One is they required, sorry, after 1970 that all the asbestos be contained. A huge amount, a third or more of all the asbestos came as a result of that ripout not being contained, and it went, and Dr. Heyer talks about it in, I think it's paragraph 15 of his supplemental declaration. So a third of it, and that amount is sufficient standing alone, and this was just from asbestos that had the government followed its own regulations, would not have gotten into the air, and thus he could not be exposed to it. So a very large amount sufficient by itself to cause mesothelioma was only in the air because of the government not following its containment regulations. The air on the ship, or the air in the, I read your brief, is largely retreating from exposure on the ship to emphasize exposure in the shipyard in general. Well, obviously it starts at the ship, but it drifts, and that's why Dr. Heyer talked about all those studies in which people develop mesothelioma from living 1,000 or 2,000 yards outside of a ship. In other words, I think it is absolutely established from his declaration and the many studies that he talks about is that not only does a shipyard giving off asbestos produce mesothelioma in people within the shipyard, but it goes for a half a mile or more outside of the shipyard. Is that how you read the declaration on page 86, paragraph 15, to be the whole location? Yes, yes. The paragraph 15, if you're talking about ER 86, is the whole period. And that covers, and what Dr. Heyer was doing in both of this, we did talk about the exposure aboard ship. And to answer your question, Judge Berzon, the on-ship exposure is that the reason he wouldn't have had it, it was after February of 71, all the times he was aboard ship. When he says he saw on quite a few occasions people insulating a pipe, the district court judge acknowledged that that raises a question as to whether they followed the requirement that anybody kind of in the area where asbestos was being installed had to wear a respirator and there had to be warning. If he had been wearing a respirator, his exposure would have been essentially zero at the times when he saw it. But because he saw it, he was just breathing the air that was right there. That's inside. You've used up your time, and I'll give you a minute of rebuttal. Okay, thank you. Thank you very much. No problem. I think it's just generally. May it please the Court, Anne Murphy for the United States. Your Honor, the district court very clearly understood in this case that the burden that plaintiffs carried was not the normal burden of simply showing exposure to asbestos fibers. Here the plaintiffs had to show that they were exposed to asbestos fibers that were released as a result of the violations of specific mandatory rules. I'm not really sure that carries as much weight as one might think, in that I gather there is evidence sufficient to get by summary judgment, and the district judge thought there was, that essentially they were not doing any containment during this period. Sorry, I don't want to interrupt, but that's not true. What the district court found was that there was a dispute. He does not find anything in summary judgment. Right. The district court determined that there was a disputed issue of fact about whether the containment practices were routinely followed. There was no, I mean, even taking everything. But the evidence, the declarations say they never did it. I mean, isn't that what they say? They put rope or they put tape, but they didn't put walls up. Yes, there is some declarations for insulators that do say that they saw, that they determined that. All right, so for summary judgment purposes, that's the record. Okay, so that's. So if they didn't do it at all, i.e. they didn't put barriers up at all, then with regard to removal at least, where I gather is where most of the dust and stuff that gets out from the immediate area occurs. Also, I guess there's sawing issues. There was also something in the declarations about they would saw and then they'd open the door, which they're not supposed to do. So what exactly as to the release of asbestos into the air due to sawing and removal, it doesn't appear, it appears that the record says that they just didn't contain them very at the end. And therefore, it's the same as if there were no regulations and they simply were not containing them at all. Well, Your Honor, I think that the district court assumed for the purposes of summary judgment that there were. I'm asking you what the record there is. Could the record, could a trier of fact find that? A trier of fact could find that. The district court held the trier of fact could find violations of the regulations. I'm happy to assume that. That's fine. What the district court. Continual and pervasive and essentially non-ending violations with regard to that particular issue. Not the warnings and not the masks and so on, but the containment of dust. I think that would be drawing too many inferences in favor of the plaintiff. But let's assume for the point of this discussion that there are rules violations after March 1970. What the district court held was that even assuming violations, what you didn't have was more than speculative evidence that Mr. Bartz and his comings and goings at the shipyard was exposed to asbestos fibers as a result. Okay, I understand that. But all that does is back out this regulatory problem, which is the unusual part of this case, as simply not being pertinent to the questions that we're looking at. In other words, it seems to me, then we're just getting back to really the same issues as in the Lockwood set of cases about how much exposure was there and how much was proven and how close was he to it and all that. And the fact that he also had to prove causation due to the violation of the regulations doesn't seem to me to matter because it seems to me he's proven that whatever exposure there was was due to violation of the regulations. Your Honor, the way that the asbestos exposure causal factor thing works is I want to point your attention to Dr. Selikoff at page 122 of the record. You show exposure to asbestos fibers. You can either show a brief exposure, which is intense, or you can show a long-term exposure at a very low level. Let's assume that there were rule violations. We also know, tragically, that because in the 1970s the Navy, like everybody else, was completely unaware of the risks of mesothelioma, these regulations were in place to stop asbestosis. They were primarily designed to protect the workers, and when they came in, following the regulations would have allowed some fibers to escape. So not only do we have messed up bots at the ship, Your Honor. But then we have the evidence that that's why it's 90% and not 100%. I don't understand why that helps you because it seems to me that in your analysis, as I read it, you're asking us to take the inferences in favor of your client and not the other way around. Not at all, Your Honor. We're assuming that there are fibers released, but this is why it's different from the Washington cases. In those cases, somebody is liable for all of it. It's just a question of determining which of the manufacturers supplied a certain amount of the product. And I would like to point out the district court was completely right, too, about the Washington cases, which is that in all of the Washington cases there was evidence that each of the workers was directly exposed intensely to actual dust caused by asbestos products. They're all working around asbestos products or their rigors and asbestos. But one of them was a child who was exposed to asbestos that came home. That's right, but the dust came home on the clothes and it was shaken out right in front of the child. So we have actual known asbestos dust being inhaled by the person. But we have that here, too, in the declaration that we were talking about with opposing counsel. There's a quantification that it would have been 20% of the work time per year. Your Honor, I disagree with the quantification issue. Well, I know you do, but why don't we have to take that as true for the purpose of summary judgment? Just to be clear, we're not disputing the amount of time that Mr. Botts was at the shipyard. So the 20% of his work year part we are not disputing. Didn't the district court overly restrict itself as far as the time frame that it was looking at exposure? It was looking at this one-month window, but wouldn't it have been fair to look at the exposure from 71 to 75, given the number of times that Mr. Botts would have been at the shipyards, considering this ongoing release of asbestos in violation of the regulations? I think that the district court did actually look at the other evidence. And I'd like to point out that there's two different ways to show the kinds of exposure. One is you show actual exposure to the actual dust, which is occupational exposure. That's what the Washington cases are about. And that's where the district court concluded that there was no evidence that Mr. Botts was actually exposed to actual... He was not exposed to actual dust from the asbestos. He never saw removal. He never saw a fabrication shack. He only perhaps witnessed installation at a distance.  And on the environmental exposure, Your Honor, the evidence that Dr. Heyer relies on, I'd like to point out that Dr. Heyer never opines that, in fact, he thinks that Mr. Botts received a substantial amount of exposure. I know that on page 11 of the reply brief, there is some counsel determines that he does, but there's serious problems with that evidence, with that calculation based on the evidence, because Dr. Heyer is actually quite careful. He says the dose is important, how much you get and how you get it. Then he looks at insulator data, which is not relevant here, as the district court said, because Mr. Botts is not an insulator. He's not working around it. He's coming, he's delivering food, and he's delivering it to the galley. And so we're really in the environmental exposure. And at page 66 of the record, there's a dispersal chart that Dr. Heyer also looked at, which shows you how much of the asbestos fiber that was released during work in the compartment and then outside the compartment at the dining room. And let's not forget Mr. Botts is delivering food to the galley. And by the time you get to the dining room, you're at 0.05 fibers. Similarly, in the environmental exposure, council was talking about being exposed outside Puget Sound, right? Very close to Puget Sound. And that's in the record at page 118. And again, it's in the 0.002 fibers per thing. And the expert in that case says the asbestos came from break linings, constructions, industrial processes, and demolition. So it's at that level of concentration, I think the district court is correct to conclude that it would be speculation to conclude that that kind of exposure with Mr. Botts there for so short a time would have been a substantial factor in causing mesothelioma. And the other thing that Dr. Heyer says, which is very relevant to the environmental exposure, is at page 237, he cites a study which says that you have a high probability of environmental exposure living within an asbestos mine or works. But he says living near asbestos industries, and we're talking about living over a long period of time, is associated with an increased but not statistically significant risk. And that's at page 237 of the record. So what plaintiff doesn't have, and what the district court correctly found, there's no evidence of the kind of occupational exposure that was enough in the White Washington cases. Direct exposure to the dust, often over many years, by people. And every single one of those cases... In the Berry case, for example... Yes, Berry. It says that he... Let's see. It says he worked around the insulators and insulation materials, Your Honor. That's at 14... He didn't say that. It doesn't say that. He worked around insulators who used insulation materials. It doesn't say that he worked around the insulation process. Well, it says he worked around the insulators and the insulation materials. And nobody disputes that when they're actually... Where does it say that? It doesn't say that. I'm reading it. He worked aboard a number of ships, including the Nevada and Saratoga, for most of these periods, and worked around insulators who used insulation materials that created substantial amounts of dust. Right. So the insulators are there. They're soaring, as just Berzon said earlier. They're soaring, they're chopping the dust going into the air. And there is Mr. Berry, and he's a machinist for seven years. So that's exactly what I'm talking about. That's occupational exposure. And that's where the kind of data that Dr. Heyer is using, the data that he gets from Mr. Beckett at page 82, that's the kind of data, that's the kind of exposure that an insulator or a shipyard worker gets. And what the district court concluded was that Mr. Bartz did not get that type of exposure. And I'd just like to correct something that counsel said. He was talking about the Beckett opinion at page 83 of the record, and he was saying that the evidence showed that most of the asbestos exposure at the naval base would have come from RIPPAT. And in fact, what Dr. Heyer says, it's quite careful, he says most of the asbestos exposure in the Beckett data, so that's the insulator data, it doesn't mean that over the entire shipyard it's all going to come from asbestos removal. And so the notion that asbestos removal is going to cause these high levels outside the compartment where it's being used and over this entire period simply isn't supported by the record. I'm going back to Barry, and I'm really having a hard time with your representation about what's in it. It says the proximity and time factors are satisfied by the fact that Barry worked at PSNS during the time that asbestos products were used. There was testimony that asbestos fibers have the ability to disperse over the entire shipyard, and that's sufficient evidence from which it could be inferred that he breathed the asbestos regardless of whether he worked on the ships or only in the shipyard. Right, it's true. And if you look, I believe that... I'm afraid I can't find Barry, although I meant to have it. At that point, what the court's doing is it's quoting, it's saying what it thought the expert said in Barry, right? That the asbestos fibers were... No, it's not. This is the application of the Lockwood criteria. That's what I'm reading from it. This is the legal analysis as to why this was sufficient. Right, but it's also true that they have him working around the insulation and the insulation materials. I understand that in Barry they also do make these comments about the fibers drifting, and I think that's one of the reasons why the district court said, you know, these cases are not going to be sufficient to get past summary judgment in a federal district court because we need more than a scintilla of evidence. And this drifting around the ship evidence is not enough to produce more than a scintilla of evidence that somebody like Mr. Bartz, who was actually only present at the shipyard, even accepting all of the presence that plaintiff postulates, it's only going to be, I think they said, 1.2 working years. And so I think the Barry analysis is not going to work here where they have to show exposure to specific types of fiber, to fibers that were released as a result of rule violations. We already know, and it has to be a substantial factor, to the mesothelioma. We already know that Mr. Bartz most unfortunately has terrific exposure to asbestos from his work for private companies and also from his work at PSNS. Your time is up if you want to just wrap up. Well, Your Honor, I think it's very important to look really carefully at the expert testimony rather than what counsel says about the expert testimony and to be very careful that the court understands what the expert is saying about the dose of exposure and how long the person was exposed. For the environmental exposure, there just wasn't enough time for Mr. Bartz to get sick from just the fabric, from fibers in the very low concentrations that were outside the compartments in the shipyard, and there just is no evidence that Mr. Bartz had any of the kind of occupational exposure that gave rise to liability in the Washington cases. Your Honor, we think we should adjourn. Okay, thank you very much. Thank you. Mr. Redstock, we'll give you one minute of rebuttal. Thank you. And actually, maybe we can extend it by another minute because I have a question, and it relates to the fourth element under Lockwood regarding medical evidence, including expert testimony on the effects of the inhalation of the asbestos on human health in general and on the plaintiff in particular. Was there any such evidence before the district court as to Mr. Bartz? There was a medical record in there. I don't have it in front of me from a doctor in Michigan. And what was the upshot of that? It was that, well, it was primarily diagnosis. It was diagnosing the mesothelioma. Pardon me. The evidence that is in there, gosh, let me see if I can remember. We had a doctor. What is the evidence is that anybody who was exposed to X amount of asbestos. And X amount is a small figure. It's .07 fiber per CC years, which is much less than Mr. Bartz got simply from the part, the amount of asbestos that was released from a tear-out. And Dr. Heyer said that, that that amount more than doubles one's risk of contracting mesothelioma. Therefore, anybody who has that much asbestos can get mesothelioma. The way this works is because you have lots of exposures, you can never literally tell it was Joe Jones' asbestos that did it. So what they do is they look at, was there enough asbestos to have caused the problem, which is what the most rudest court says. And here there was such. But in other cases, don't you actually have medical experts giving an opinion as to the effects of the inhalation on a particular? Sometimes, yes. Sometimes, no. I mean, it's not the case. It's not the case always. The two points I wanted to make is that both in the Berry case that Judge Berzon talked about and the Allen case, the only exposure was shipyard-wide exposure. Because... I thought Allen was actually an insulator. He was an insulator, but... Not his father, his father. His dad was, it was a two-step. His dad was an insulator, but there was no way of telling what shifts the product there. It was an asbestos cloth. You couldn't tell where it was used. So there was no way of knowing if it was on the same ship that his father was. And the court, I think, says it explicitly. And they say, they quote Berry, which says some of that language you were quoting, that it's a shipyard-wide exposure. They could not place that material on any ship that Mr. Allen's dad worked. So the only way his dad could have gotten the exposure as far as they could tell, was from the asbestos from that cloth in the air in the shipyard. And there, then it was one step farther removed. He then, the dad brought it home and they shook the clothes out. So I would submit that if you read the, the only relevant exposure was shipyard-wide. Because while insulators do use asbestos cloth, it was, we don't know where it was used. All we know is that it was used somewhere in the shipyard by someone. Okay. Thank you very much. You're welcome. And thank both of you for your arguments. The case of Botts v. United States of America is submitted.
judges: Graber, Berzon, Curiel